Before we begin, we have decided the order of oral arguments and the amount of time to be allotted because of the multiple appeals that are involved here. We request that the appeal of Walsh Construction and Travelers Insurance proceed first and they will have 15 minutes as cross-appellant. We would ask Carlos Steel to proceed next with 15 minutes as cross-appellant. The third argument will be made by LB Steel, 15 minutes as appellant and 10 minutes as cross-appellate. We will return to Walsh Construction and Travelers with 10 minutes as appellate, I'm sorry, just Walsh Construction, 10 minutes as appellate and 5 minutes in reply as cross-appellant. Carlos Steel, 10 minutes as cross-appellate with a 5 minute reply as cross-appellant. And then finally, LB Steel, 5 minutes reply as appellant. And I hope that I will act as an emcee through this to help us all get through it in that order. May I ask is Walsh Construction and Travelers Insurance presenting one argument? Yes, ma'am. Wonderful. Okay, as I ask you to speak up so we can hear you, the microphone does not amplify the recording. And so I think we can begin with Walsh Construction and Travelers Insurance and again, 15 minutes as cross-appellant. May it please the court. My name is James Fuglio. I'm appearing on behalf of Walsh Construction Company and Travelers as insured. Pursuant to the court's instructions on the order of oral argument, my understanding is I should direct my remarks at this time to the cross-appeal that Walsh has filed with respect to the claims in this case. Which is joint with Travelers Insurance. Right. And to just set our position, Walsh does not believe it should be necessary, respectfully, to reach the issues raised by its cross-appeal. Because we believe Judge Griffin's order ought to be affirmed in its entirety. And if it is affirmed in its entirety, the cross-appeal would not be necessary. However, and I will address my comments in the event there is any modification that you may need. Are you conceding the correctness of the judgment entered against you in favor of L.B. Steele? We believe that the judge's order ought to be taken as a whole. And as a whole, he entered a net judgment, in our opinion, of $19,187,000. He entered a judgment that was set off. Pardon? He entered a judgment that was set off, but I didn't read your brief as suggesting you were conceding that a judgment for $6.5 million was properly entered against you in favor of L.B. Steele. No, we don't. Well, then don't say that you want his whole order of the fund was written. Well, Your Honor, if it's read as a whole, we have no objection to a credit being given to L.B. Steele, assuming Wall's construction is made completely whole from the damages that occurred by L.B. Steele's breach. But I'll be happy to address the particular question you've raised, and I think the subject of this cross-appeal. We believe to the extent that there is any judgment that's been entered in favor of L.B. Steele on its contract, that would be error and should be reversed. And the reason we say that is that there's a couple of issues. There's one relating to the privity of contract, but the main issue in our judgment is the evidence. This is a six-week trial before Judge Griffin, and the evidence was so overwhelming about L.B. Steele's breach. When you look at this case, this is a case about the permits 2 and 3 at O'Hare, and L.B. Steele's job was to fabricate the steel and do the welding. It's in the course of the performance of that contract that L.B. Steele just seriously failed to perform its contract, to the point where the city, at one point in time, issued a stability warning. In other words, there was a risk of collapse, a catastrophic collapse, because of the poor workmanship of L.B. Steele. And Walsh, as a consequence, had to go out and shore up the canopies and the columns, and then engage in a very extensive professional investigation and work to fix it in the most cost-effective and safe way. And they did that, and the record is just replete with all the evidence that they... It was entered against Walsh, in favor of L.B. Steele, as the indemnitore of Cairo. So the question becomes, did Cairo breach? And was L.B. Steele in favor of judgment against Cairo and Walsh as its indemnitore? Right. Which meant Walsh was the enemy of Cairo. And into an assembly agreement with Cairo. Cairo had the subcontract with L.B. Steele. Walsh had the subcontract with Cairo. Then... We understand what happened. The same. All of Walsh... The subcontract is against Cairo, relating to the project, in order to indemnify Cairo for claims arising from Walsh's failure to pay Cairo, which in turn should have been provided to the subcontractors. Now, that's a quote. You're an indemnitore. And so if you're an indemnitore, a judgment for $6.5 million was entered against you as an indemnitore. Now, is that judgment correct? Or isn't it correct? No, it's not. It's not correct. Because L.B. Steele materially and seriously breached its contract with Cairo L. Steele, which was assigned to Walsh. And that breach was so extensive, and it happened as they were doing the work, and it was only discovered later when cracks started showing up in the columns. The investigation showed that of the critical wells for this project, 90% were defective and didn't conform to the standards. It showed that every, 100% of the work of the wells that related to support the canopy that were inspected, that were actually inspected, were defective. That is the kind of a breach that is so pervasive. There was a problem, though, that were actually tested. L.B. Steele is saying that not everything was tested. Not everything was tested. There were wells of wells that were okay. But, again, when you just think about that for a moment, I've been listening very frequently where there's defective work that threatens the actual stability of the project. And so, you know, there was other work that was okay. We don't even know it's okay. It's just that the cost of inspecting every one of those wells would have been so time-consuming and expensive that we would have been accused of not reasonably mitigating our damages. What we did, what Walsh did, was, and Judge Griffin found this. This is not just me talking. The evidence from Judge Griffin's ruling very clearly found that Walsh responded exactly the way it needed to, to a potential catastrophe. And the city was waving red flags over and over again about this work. And legally, here, since we have proved that, and Judge Griffin has found it, L.B. Steele materially breached its obligations by defective workmanship, which was not just marginal. It was material, serious, and dangerous. And the inspection that Walsh done showed that every column had crack. Every column. If your liability for the $6.5 million is as an indemnitore, really what you ought to be arguing is that Carle didn't breach the contract to L.B. Steele for whatever reason, and therefore you can't be held liable as an indemnitore. But it has to relate to the liability of Carle, because your liability is solely as an indemnitore of Carle. Well, Your Honor, we are also an affidavit of Carle. I have the right to assert whatever defenses and claims that they have. Well, there's no question. You have every right in the world to assert the defenses that Carle has, but I haven't heard any. Well, Carle has the same defense. Well, then why do you feel that we have to disagree and then argue what defense Carle has, and therefore your liability continues indemnitore? I'll argue it as indemnitore and as S&E, but I will say the same thing. It's the same defective workmanship which was pervasive and serious in a material breach that excuses any further performance under a contract. The restatement says that there's cases galore in South Florida. I have the right to argue, but what is the contract between Carle and L.B. Steele saying? Well, here's what the contract says, and it incorporates by reference the standards that apply to the job for steelwork, verification, and welding. And it says that you have that L.B. Steele, as a subcontractor for Carle Steel, has to perform in accordance with standards, the standards that were incorporated by reference as part of the complaint and which were referenced in the evidence and in Judge Griffin's ruling. And so L.B. Steele has breached its contract to Carle, and because we're the S&E, they breached its contract to us. And as an indemnitore, the same thing would apply. If Carle acted in accordance with this obligation, which it did, and L.B. Steele breached its contract first, then Carle Steel was excused from further performance. The South Florida case, which we said in our brief, addresses that issue about the importance of performance, and if you fail to perform, you breach a contract and you're not entitled to enforce any other contractual rights. The restatement says the same thing. Section 237 talks about the effect on the other party's duty to failure to render performance. Once a client to a contract materially breaches his contract, future performance by the other party is excused as a matter of law. If you look at this right here, perhaps the clearest findings, and the most time and evidence spent on it, was L.B. Steele's breach. And it was an extensive breach. And once it's breached, there's no further obligation to perform the contract by the other side, and L.B. Steele has no right to make them further. So, our lawsuit here is founded on that very point. L.B. Steele breached. It breached first, it was material, it was pervasive, it was serious, and any other party's Carle Steel or Carle Steel... I understand that argument. You made two other arguments as to why the $6.5 million should never have been handed against Walsh. I don't understand what your argument is. First, you contend that L.B. Steele didn't win a judgment against Walsh. But that's not what the order says. The order specifically says judgment is entered against Carle and Walsh in favor of L.B. Steele for $6.5 million. So, I don't understand how you make the argument that no judgment was entered against them. No judgment was entered in favor of Carle against... No, you made the argument that said L.B. Steele never got a judgment against Walsh. Well, they never should have obtained... That's a little different than saying they didn't get one. Now we're getting back to my main argument, which is that the judgment order did not award a judgment in the classic sense to L.B. Steele. What it did is it gave L.B. Steele a credit for the balance due under the contract, given the fact that Walsh was going to be made a federal by the 27-and-a-half million dollars. Let me read the judgment. Paragraph 3 of the judgment. The judgment is entered in favor of L.B. Steele and is against Carle and Walsh on outlawing L.B. Steele's counterpoint. The breach of contract is worth $6.5 million. I mean, that's what it says. It doesn't sound like a judgment, does it? It sounds like that was the only paragraph in the order. Excuse me. We're going to get to the issue of set-off when we hear from L.B. Steele. But the fact of the matter is, there's just an incorrect statement in your brief. A judgment was entered against him. Whether it should have been is another issue. I understand your honest view on that. But, respectfully, it's our position that the judgment order... It would be a mistake to focus just on the individual paragraphs. Because, in paragraph 1 of that judgment order, after he goes through each of his rulings, he summarizes by saying, quote, L.B. Steele shall be entitled to a credit of $6.5 million based upon his contract claims, bond claim, and lien claim, and $1.8 million plus accrued interest based on L.B. Steele's claims against CalTest and in the funds deposited by CalTest. Which amounts shall be set off against Ross Construction Company's judgment? For a net judgment in favor of Ross Construction Company and against L.B. Steele in the amount of $19.1 million. Mr. Kingley, if the only way you can read this reasonably is, this judge uses the word credit and set-off as synonyms. I mean, that's all it did. And second of all, the judgment that was added against Ross Construction in paragraph 3, was Ross Construction as the indemnitore of Carl. It wasn't as against Ross Construction individually, meaning directly against him. It was as the indemnitore of Carl. It was as the epitome of Carl. I understand the indemnity language in there as well. But either way you look at it, if you break it down, as your Honor suggested, that each of these paragraphs... How is it different than set-off, the word credit? Well, if I did a $100 judgment against you, and you would have a $50 judgment against me, no set-off, the $50 judgment you would have against me, we could call it a credit as against the $100, and it's still a net of $50. And the net, and your Honor just hit it right on the head. The net was $50. Whether you call it a set-off... It doesn't make any difference. You still get a $50 judgment against me. The net judgment? Yes. No, not the net judgment. You get a $50 judgment. I'll change it so it isn't $50. Okay. Your Honor, frankly, I think we're arguing about something that I shouldn't get to argue about. I want to raise another issue. You contend that no judgment should have been entered against Walsh, because Walsh was not in privy with L.B. Steele. Well, that was the assignee of Carle. If Carle was in privy, Walsh is now in privy. Agreed, with respect to the Walsh. With Walsh. The assignment was we received Walsh for consideration. We received all the rights that Carle Steele had under his contract, and that is obligations. And that's the issue of why we're saying there's no privity with respect to the obligations. And that's an upbreak. And I think that probably over my time, my basic argument is that L.B. Steele's briefs, first, was material, and to the extent the review focuses on individual judgments, that judgment ought to be reversed, because there's no basis for finding that. And I think if your position is that the judgment against Walsh falls, so also does the judgment against Carle. Yes. That's for sure. Thank you, counsel. So Carle Steele, 15 minutes at clock at law. Good morning, Your Honor. My name is Brian Dunigan, and I represent the Carle Steele Corporation. Judge, I don't think I'm going to take 15 minutes. I have a question for you that you may not like. Could you please tell us why we have jurisdiction over your appeal? My appeal is time to file against Walsh? Against L.B. Steele? Against L.B. Steele, yes. The Bankruptcy Court never lifted the stay of Carle. The specific order says the stay was lifted to allow the appeals of travelers in Walsh. Not a word about Carle. My understanding from the Bankruptcy Court, Your Honor, is that the stay was listed as to any appeal. I've read the orders. They do not say that. It says the automatic stay is modified to allow Walsh to file a notice of cross-appeal. The May 10th order modified the automatic stay to allow L.B. Steele and Walsh to proceed with their appeals. Not a word about Carle. This is the first time that I've heard that this is not a possibility. We've got to examine our own jurisdiction. In 362A of the Bankruptcy Court, it's pretty clear. The stay is in effect unless lifted by the Bankruptcy Court, and I can't find a single order in this case that says the stay was lifted to allow your appeal to proceed. Your Honor, I'm just giving you my understanding. Okay. Your Honor, go ahead. It's the position of Carle Steele that the in-judgment part of this order is against Carle Steele, his error. Certainly L.B. Steele materially breached this contract with Carle. Your Honor, I asked what the duty of L.B. Steele was. They were to fabricate and erect all steel for the canopy structure as per plans and specifications, including all necessary shop drawings, nuts and bolts, et cetera. And as you are fully described in Exhibit G, and Exhibit G is the Walsh Construction Carle Steele Prime Agreement. Judge, their duty was to fabricate the steel in accordance with the standards of the American Welding Society. They delivered their products to O'Hare Field, and the cracks were discovered in the welds located in the top skins of the roof canopy structure and in the columns themselves. They materially breached their subcontract. The inspections showed that 90 percent of the welds that were investigated and tested were flawed, defective, and did not meet American welding standards. The columns, there were 35 columns that supported the canopy structure. Every one of them, 100 percent, were found to have defects and cracks, and were found to have steel that was not properly fabricated in accordance with the standards. The canopy structure itself, the roofing, was delaminated and cracked and showed connections of the roof to the columns were not done per the project plans and specifications and the standards of AWS. In turn, and as a result, and I'm sure as you've read in our briefs, Walsh had to engineer around those defects created by L.B. Steel, and that investigation and that engineering around their defective products is what caused the damages in this case. In addition, this contract, the subcontract between Tarlow and L.B. Steel, has a condition precedent which is set out in paragraph 10.2, and the condition precedent specifically says, Received payment to Tarlow Steel from Walsh for subcontract work is a condition precedent to payment by Tarlow Steel to subcontract. Subcontractor acknowledges that it relies on a credit of the owner, the city of Chicago, not Tarlow Steel for payment of the subcontract work. So, after these cracks and delaminations were found to exist in the canopy structure, the city stopped payment. Walsh was never paid by the city, and the city did not, and Walsh did not in turn pay Tarlow. So there's a failure of the condition precedent, which was directly caused by the work product of L.B. Steel. And basically, that's my appeal, is that that judgment order entered is error. There should never be a $6.5 million judgment entered against Tarlow Steel, who did nothing to breach this contract. All Tarlow Steel did was order the steel. It was the fabrication of L.B. Steel that caused the entire mess at O'Hare Field. And this judgment, in my opinion, is error. Thank you. Thank you, John. L.B. Steel, 15 minutes as appellant and 10 minutes as prosecutor. Good morning again. May it please the court, my name is Dan Dross, and I represent L.B. Steel. The appellant, class of 1908. In this case, the order entered by the circuit court unambiguously entered multiple judgments. The order then set off certain judgments, including judgments between different parties. The set off of judgments between different parties is clearly prohibited by Illinois law, and was therefore error, and must be reversed. The order also failed to reduce the $27.5 million judgment entered in favor of Walsh by an $8 million payment Walsh received from an insurance company, based on a policy which covered work done by L.B. Steel's design professionals, such as I.R. Johnson. This was also error. Let's get to it, if you want to talk about the Zurich policy. The Zurich policy, as I understand it, ensured Walsh from an actual or less negligent act, error, or omission with respect to the rendering or the failing to render professional services by Walsh, or any entity for which Walsh is legally responsible. Who was Walsh legally responsible for the rendered professional services? L.B. Steel and its design professional, I.R. Johnson. So, why would Walsh be entitled? First of all, L.B. Steel didn't do any professional service. They fabricated and welded. That's actually not correct, Your Honor. So, this whole problem arose because the design of the engineer of the record was faulty. So, what happened, Your Honor, is they discovered it was faulty and it required a whole host of counsel. The welds were so bad, some of them didn't even join metal to metal. I've read this record. The performance by L.B. Steel is overwhelmingly poor, and that's why there was a $27 million judgment entered against you for which you have not appealed. But that doesn't answer the question I thought you asked, which was, why was there a design professional who recovered? And the reason is, Your Honor, is because after this colossal mistake by Werner Sobeck, the parties got together and they talked to L.B. Steel, and L.B. Steel hired a design professional, R.I. Johnson, to help with the redesign of the welds. So, why would Walsh Construction be responsible for the design professional that L.B. Steel hired? Walsh is not responsible for who L.B. Steel hired. They didn't hire him. They didn't pay him. Well, as general contractors, they're responsible for the work, and the work included a design professional, R.I. Johnson, which was hired by L.B. Steel in connection with the re-engineering and design that was caused by Werner Sobeck's mistake. So, the pleas in the City of Chicago case, which are voluminous and include those facts, Your Honor. But, as you mentioned, we're not. We haven't actually appealed the entry of the judgment of $27.5 million. But what L.B. Steel is requesting is that it's appropriate to reverse the setup of judgments between different parties, which is prohibited by our law, whether Walsh should pay L.B. Steel whatever amounts it may have received based on its enforcement of the incorrect setoffs in the order, which amount should equal the amount held in escrow by the clerk of the circuit court, which is approximately $3.5 million, and reduce the $27.5 million judgment by the $8 million. As you know from reviewing the record, the history of this case is lengthy. The problems actually began when payments or draws to L.B. Steel were not made in full beginning in June of 2004. Later in October of 2004, the wall cracks were allegedly observed on the top plate of the canopy. However, an investigation revealed that the ultimate liability for these cracks was the design of the engineer of record, Werner Solvang, not L.B. Steel. Walsh admits that it's a brief case, not. In fact, Your Honor, the City paid Walsh approximately $15 million to fix the issue caused by the engineer, not by L.B. Steel. On February 9, 2005, L.B. Steel filed suit. We filed the first action. The complaint included both Karlo and Walsh. Karlo Steel actually answered that Walsh had stopped paying it without justification in early 2004, and Walsh had thereby repudiated the contract. Later, in 2005, a new crack was allegedly discovered, and the City advised Walsh by a letter dated March 29, 2005, that welds on canopy plates were failing and the design of the weld connection of canopy plates was deficient. At that point, the City sued Walsh and others, but not L.B. Steel. Eventually, Karlo signed a subcontract with L.B. Steel to Walsh in exchange for $250,000 and an agreement of Walsh to defend and indemnify Karlo, which Your Honor brought up. Walsh sued L.B. Steel. So, L.B. Steel and Steel sued Karlo for testing, which by the way was on a contract solely because... So, we understand the facts. Let's get to the issues. Very well, Your Honor. What really happened here, Judge, is the court came out after six weeks of trial and orally announced the judgments. Around that time, Walsh learned that there was a possibility of an L.B. Steel bankruptcy. Walsh basically demanded an immediate set-off of all the judgments, whether they were between the same parties or not. L.B. Steel and others objected. L.B. Steel objected to the set-offs. L.B. Steel's lenderhood affected security interests in all of L.B. Steel's assets, including the judgments which were being entered in favor of L.B. Steel objectives. The law firm representing L.B. Steel asserted a lien and objected. However, over everyone's objection, Walsh convinced the circuit court to set-off all the judgments immediately and incorrectly. I argue, amongst other things, that the judgments all rose at the very same time. Why don't you just take them judgment by judgment and argue the legality of the set-off vis-à-vis each individual judgment? 6.5 million, 1.5 million, 1.8 million. I'd be happy to do that, and I'd just like to answer one question before that. When Your Honor was talking about the contracts, please keep in mind that Walsh eliminated L.B. Steel's right to a jury trial by enforcing its waiver of the contract by arguing that the contracts were all incorporated. Then, after the trial, and the judge indicated how he was going to rule, Walsh's attorney says, Judge, you should set-off all these because these judgments arise out of the very same contract. So this case was tried except these contracts were all won, and that's why L.B. Steel's judgment against one of the many reasons why this judgment against L.B. Walsh is correct. But in any event, Your Honor, to your point, under well-worn law, set-offs are only allowed between the same parties. The set-offs are governed by 735 I.C.S. 5-12-176-178. Section 176 states judgments between the same parties may be set-off. I think you're still not answering the top of the question. Let me try to get a little more pointed. There was a $6.5 million judgment against Walsh in favor of L.B. Steel. Is that correct? Yes or no? Yes. Why couldn't that be set-off against the $27 million in favor of Walsh's against L.B. Steel? We actually don't contest that. All right, let's move to the next one. You're not contesting. Well, because that one judgment actually included two parties incorrectly, as you remember. That's the only reason I'm bringing it up. I'm not sure it was two parties incorrectly. So it was a judgment in favor of L.B. Steel against both Walsh's. And it was set-off against Walsh's against Walsh's. Except for Walsh was brought in as an indemnitory, so there's nothing wrong with the judgment. Hence, we call it homicidal error in our initial briefing. I don't think it's error. But it was a judgment against the prime defendant plus its indemnitory. It's the same judgment. What's wrong with it? All right, next one. What about the $1.5 million? The $1.5 million arises out of a Section 23 lien. It's a judgment in rent. It's not set-offable under Section 176 because it's not against Walsh's. The judge incorrectly did say against Walsh's. But what he was doing is he was entering it on the Section 23 lien claim. It's very clear what he did. A lien claim, which should have said that L.B. Steel's lien claim was correctly perfected, and the judge should have ordered that the lien proceeds, which were held by the clerk of the circuit court, be turned over to L.B. Steel, not Walsh's. Your argument as to the $1.8 million is pretty clear. That was a judgment against gout testing. Yes. And so that's pretty clear. I don't think you even have to argue that. That was a bad set-off. That was a bad set-off, $1.8 million. Yes. Okay, what else you got? Okay. Judge, if you'd like, I could move to law here. What I would like to say, Your Honor, is that the responses of Walsh to some of these arguments are not correct. And I would ask you not only to uphold the law of the State of Illinois regarding the set-offs, but to not be the only Illinois court to ever permit a set-off of judgments between different parties, or to be the only court in the country in approximately the last 100 years or so, pursuant to CJS, to permit the set-off of judgments between different parties. What Walsh is basically doing, Your Honor, is to ask you to allow them to disobey Illinois law and, in fact, to avoid the proper application of federal bankruptcy law and shouldn't allow it. Let me ask you a question. You make an argument, kind of just a past argument, that Walsh's judgment should be reduced by whatever they recover from the St. Paul policy. Was that policy ever before the trial court? No, as a matter of fact, it did. Then how do you argue it in front of us? And it is the subject of federal litigation, is it not? It is, which has been stated in the resolution of the case. Yes, but you make an argument as to the St. Paul policy when the St. Paul policy isn't in the record, we have no idea what it says, and it was never a matter brought up before the trial court. So I suppose my question is, what right do you have to argue it on appeal? I guess it would be, in some respects, prospective, because if, in fact, they recover on that, it should reduce any judgment that Walsh might have. That certainly is in front of us. Very well. So I'll move on to address some of the points at this, looking at my time, dealing with the cross-appeal issue, if you have any questions regarding the set-offs, which were clearly wrong. As far as the cross-appeal, Judge, Justices, as I mentioned, this case was treated as if these contracts were the same. Walsh actually prevented, and obviously from having a jury trial, and had the court strike its jury demand based on its contract with Cargill Steel, even though they're now arguing they're not in privity. As a matter of fact, in the trial court, things were reversed. L.B. Steel was the one actually arguing there wasn't privity, because L.B. Steel was saying you shouldn't be allowed to get economic damages unless there's a contract involved. The trial court, in this case, obviously awarded economic damages. He obviously enforced the contract that if they were won, and as I mentioned before, when the judgments were being entered, counsel, from her behalf, actually altered for the set-offs by saying these judgments arise out of the very same contract. Justices, at this point in time, they shouldn't be allowed to say, well, you can't enter a judgment against us because you're not in privity of contract. Through the entire proceeding, through the entire case, counsel is asking me they are in privity. There's no question about it. It's a bad argument. It may be a bad argument. It just doesn't hold. I don't think you have to worry about the privity argument. What you have to worry about is the substantial compliance argument and the material breach argument vis-à-vis L.B. Steel. Let's talk about that a little bit. So, in this case, L.B. Steel put together 39 miles of wealth. The evidence before the trial court was only 1% of those somehow needed to be remediated. So, was there substantial compliance? Yes. But equally as important, and the reason I was giving you the background of the time a little bit and having the brief, is that what happened in this case wasn't what happened in the cases that Walsh is relying on. L.B. Steel didn't abandon the project until they weren't getting paid. And then they didn't even abandon it. They continued to perform on a COD basis. What happened here was, and it's right under the UCC in the pleadings, was L.B. Steel provided goods which were accepted by Carroll and Walsh and the city. Later on, after they had determined the Warner sold backs, the diner was bad, and all these other problems as they're going through everything, they then discovered some latent defects. And yet, admittedly, Your Honor, those latent defects allegedly cost $17.5 million to fix and caused alleged economic damages to Walsh of another $10 million on a settlement they paid the city. Well, they're not alleged. They appear to have been proven and part of the judgment that you're not contesting. Okay. But even if it caused that amount of damage to remediate, the goods were accepted. At trial, Walsh agreed that the amount due under the contract to L.B. Steel was $4.5 million. The judge ultimately found there was a little bit more than that. There was more than sufficient evidence in the record to support that finding, as well as the breach of contract judgment against both Carroll and Walsh. They stopped paying before there was any notice of a problem caused by L.B. Steel, and it wouldn't matter anyway. So let's take the next scenario, Judge. We have argued that the judgment in favor of L.B. Steel against Walsh for $6.5 million is correct. If it wasn't, it wouldn't change the ultimate result in this case at all. The trial court correctly found that you can't give a judgment for quantum meriwith if, in fact, there's a breach of contract judgment. He gave the breach of contract judgment. If, in fact, there was some reason he couldn't, and by the way, I'm in no way suggesting that that's the case, he could have and would have just as easily entered a quantum meriwith judgment. Except for one problem. If there was a quantum meriwith, you were the burden to introduce some evidence specific enough to prove the reasonable value of the benefit allegedly received by Walsh. In this case, you introduced no evidence at trial, either to establish the value that Walsh allegedly received from the partial performance on the subcontract, or to prove that the value exceeded the injury that was caused by your breach of contract. So we've got a failure of proof on the quantum meriwith judgment point. Actually, I would disagree, honestly, on the first part, at least on the first part of your statement, which is there was no evidence presented. In fact, Walsh agreed that $4.5 million was due under the contract for our goods provided. But after the other $2 million, there's a good explanation in the trial brief about L.B. Steele and the time lag for damages and what that amounted to, Judge, and why I think it was increased from $4.5 million to $6.5 million, is Cardinal and Walsh had failed to pay L.B. Steele for over $3 million of work that was recognized by the city to be extra and additional work, but for which the amount of additional compensation to L.B. Steele was not agreed. That's in the record at C-9365. So there was plenty of evidence to support the damages for the $6.5 million. To your point as to whether it exceeded what was owed to Walsh, the court found that it didn't. But that doesn't mean that there wouldn't be a reduction. You wouldn't enter a judgment even for quantum merit on the $6.5 million and just set it off as we've not contested with the judgment entered in favor of Walsh against L.B. Steele. So you've come to the same point, and that was my point, Your Honor. While we're not at all conceding that the judgment entered against Walsh in the amount of $6.5 million kind of breach of contract is incorrect, because it's not incorrect, it's supported by the evidence, and it should be upheld, if, in fact, for any reason, that judgment was going to be reversed, there are a myriad of ways to which Your Honor should do or the Circuit Court would have done to enter a judgment for the same amount. And that set-off is appropriate, right, because that set-off is between the same parties. Walsh has a judgment against L.B. Steele for $27.5 million. L.B. Steele has a judgment against Walsh for $6.5 million. That judgment, we're not contesting the set-off. I didn't get the set-off in the lead. That's a good point, Your Honor. So here's how I believe those interact. The set-off is correct. It was given in that one instance correctly by the trial court, and the set-off was the $27.5 million judgment in favor of Walsh against L.B. Steele against the $6.5 million judgment in favor of L.B. Steele against Walsh. That's correct. That number includes the lien amount, not the actual lien. So Walsh has already been credited, received credit for that. That's why it's so important, and so correct legally, that the lien amount, which has now already been credited to the judgment for Walsh, and which was entered separately and upon which was entered separately. Was Walsh credited to you? No. So then I'm not saying it correctly. So the lien amount includes amounts. The $6.5 million judgment includes the same value that had been set aside pursuant to the lien, which was found to be correct and which can't be set off. That $6.5 million, so Walsh has already received the benefit of that amount. The counts was a Section 23 count and a lien count, and the money was put aside, and it then becomes an in-rem action. The judgment was correctly entered on the lien action, although the wording was a little wrong, and it cannot be set off. But don't fear that Walsh didn't get credit for that amount because it's included in the $6.5 million judgment. But even if it wasn't, it wouldn't matter, meaning the lien amount is a separate action. It was fed separately. It was adjudicated separately. It became an in-rem action, and the judge correctly entered the judgment on the lien. I mean, he just incorrectly set it off against the $27.5 million judgment. Would you be entitled to recovery under the lien if the determination was made that you did not substantially perform under your contract? Did your material breach prevent it from finding a substantial amount? Yes, and here's why. I think those terms are being intermingled. They're not intermingled. They're different. They are different. And here's, as I mentioned before this, Allen Steel provides goods under the UCC. Those goods were accepted and had a value, and the judge determined what that value was, and he eventually determined that there was a lien that was part of that value, and that the lien found a judgment, and he just incorrectly then set it off. The cases that Walsh is talking about were substantial performance in those things. This is not just that case. Meaning, Walsh and Allen Steel performed after the fact. They determined that there were lien defects in the work, and so then the correct measure of damages is what happened, which is, okay, you're owed what you're owed, meaning Allen Steel is owed $6.5 million, and Walsh is owed his remediation damages. That's what all the case law says regarding all those issues. So, interestingly, in these aggregate cases, you can't enforce a mechanic's lien until you prove that you substantially performed under the contract. If you materially breach the contract, and by the way, the findings of this court were, this is not a minor breach. This court found that it affected the very stability of the canopy, and that is L.B. Steel's defective wells. I think what the finding is, is that L.B. Steel, the 39 miles worth of wells, all of which, a very small percentage of those wells were defective and needed to be reset for one problem. The very small percentage that were defective affected the structural stability of the whole canopy. But that doesn't preclude substantial performance, meaning L.B. Steel performed. A very small percentage of the wells that they performed turned out to be defective. Counselor, let me ask you a question. I'm just, you know, I'm not too bright, so I make these real complicated, real simple for me. If you're hired to perform five wells on some structure, and four were good, but one was so bad the structure collapses, do you think you're substantially performing? In this case, you are. No, no. Yes. It could be, and this backs it up, and here's why. In this case, what you would say is, let's say you were building a house, and although this is a UCC issue, Judge, so it's a little different, but let's just take it outside of UCC, which you shouldn't for legal purposes, because it's acceptance and rejection, and it's good you accepted and later remediated, so these aren't issues. But let's just say you built a house, and three years later, it turns out that there was on a small portion of the house, there was a very serious defect that cost more than the house to build and fix. You would still have substantially performed and been paid under the contract, maybe even cheated under the contract and gotten a judgment under it, but that doesn't mean that they wouldn't then be entitled to the damages for remediation. In this case, Judge, under the Uniform Commercial Code, which is what the experts were talking about, which was the evidence that was presented at trial, the goods that were supplied by LBCO were accepted, not rejected. They didn't even rip out the goods after the fact. What they did was they remediated them. They went around them. That, in itself, means that the lien is good and they're entitled to payment. So I hope that answers your question. I'm sorry, and I do have a few minutes for rebuttal, so then I'll stay with that. Thank you, Judge. Thanks so much. And so we lost instruction. Final defilee in five and reply. May I please clarify? Can I just clarify that my comments should be directed at the defending the appeal? Yes, and the reply is processed. Are you responding to their appeal? Yes, I am. Ten minutes of defilee to LBCO. And five minutes in reply as process allows. Thank you, Judge. May I please have a question? As we sort through this and as I hear the questions and the arguments, it seems to me that it's very clear that regardless of whether you break these down into particular paragraphs or you look at the judgment as a whole, the claims that demand, for a moment, putting aside our cross-appeal about that there is no entitlement to 6.5 at all, but just assuming there is for the purposes of this defending this appeal, that the $6.5 million, whether you view it as an offset or a credit, it's appropriate because it's the same party in essence. Whether it's Kyle Steele, as they admit, it's the same party because they're ethnic, or whether it's Travers because Travers is a shirt. And the case law and the statute recognizes that you look, the court has the power to look behind the names to see if the party is actually the same. And, for example, with Travers, the case they cite, the Brown versus Farkas case, recognizes that ordinarily, if the parties are different, there's no set-up. But you've got to look behind you. You've got to look at the equity of the situation. And they specifically recognize in CJS, the authority that's relied on in that case, that, for example, a shirt is the same as the principal. The obligations are the same, the rights are the same, and therefore to the extent there's a set-up, it should be the same party as equity is concerned. And that's the authority upon which this whole set-up is based. So that's the 6.5. And that's related to Travers as surrogate. Carlo and Walsh, both his master and he were Walsh's master and he was Carlo, and which obviously was conceded as the same party. Even though they're different, they're the same because you look beyond just the name of the party and you look at their rights to obligations. Carlo, Walsh, and Travers, with respect to that 6.5, are the same issues. He's talking about paragraph four. Paragraph four is the judgment they provide to the steel in the city for the use of the property. Obviously, that's against Travers. Yes, the Travers count is the surrogate count. And that judgment should be offset against the judgment in favor of Walsh because Travers' surrogate stands in the same shoes as its principal, Walsh. So when you look at the actual situation, as the case is saying you should and must, it's the same party. So even if you look at it as an offset, it is an offset between the same parties. Twenty-seven and a half million dollars damage judgment from staying at that and a 6.5 million judgment against Walsh and Travers. Now, let's... Was there a material breach of contract and was there substantial performance? There are two different concepts. Is the breach material? Was the breach material? And was there substantial performance? The answer is the same to both. There was a material breach and there was a lack of substantial performance by LV Steel. And the reason the answer is the same, although the analysis may be a little different, is that the whole essence of their contract was to fabricate and perform welds in accordance with the standards required for safety and stability of the camp. I take it, I take it, your argument is there was nothing wrong with the design. Where the breach was is the manner in which they fabricated it, i.e. the welding. The welding and the fabrication, yes. With respect to LV Steel, there were other issues on design, but they're not related to this case and they're not about this case. The claim against LV Steel for breach of contract was because they failed to substantially perform and breached the essence of the whole agreement, the welds in accord with the standards and with industry practices and safety. And the evidence is so overwhelming that they failed to do so. It cost Walsh at least $27.5 million. We even argued for more than that to fix this. But what about the 39 miles that your opponent keeps referencing? Why isn't that substantial compliance? Because, you know, and there's a couple of answers to that question. One is that there's not a whole lot of evidence about the 35 to 39 million, and the suggestion that they were all performed well is so contrary to the evidence. No, no, I don't think they even contend that they were all there. They contend that they did 39 miles worth and only 1,000 feet were bad. But that's an assumption because only 1,000 feet were inspected. I mean, the difference is so clear that 90% of the critical welds are defective, and all of the columns have cracks in them due to the defective welding. All of the ones inspected? All, 90% of the critical welds that were inspected were defective. According to one of the originators' testimonies, I believe he testified that the welds that required remediation were critical for the safety of the whole canopy, and the cracks that existed in the welds rendered them totally ineffective, and only a fraction of the required volume, and in some cases there was no weld touching the metal connecting both sides. And if I could just explain why, you know, because the question is why didn't they test all these and stuff. Walsh's engineers, these same engineers, they designed a fix that would bypass the welds so that they didn't have to do the inspection, they didn't have to check everyone. We are going to assume in fixing this that we're going to find similar conditions, and it was so much less expensive to fix it the way Walsh's engineers fixed it than going through and inspecting every weld, we would have been accused, I think Walsh would have been accused of not mitigating its damages when it was able to design a fix that bypassed the defective welds. It worked, and the evidence is really so overwhelming here that L.B. Steele's performance failed. What about Zurich? What about Zurich? The Zurich auctioneer offers something different. It's a policy that's different than the claims made here, and that's because the claims against L.B. Steele were for defective performance of the welds, not for the failure to design anything. The design issues were other issues, other things. For example, sidewalks. One of the things that they covered were sidewalks, the design of sidewalks and the project. It wasn't related to these claims, and it's very clearly not related to these claims, and that's what Judge Griffin found, and he had plenty of evidence to do it. I believe his exact finding, by the way, his oral finding, was there was a need for remediation to the defective welds, not the design. Right. I do want to address a couple of things, a couple of other parts of this judgment that have been focused on. The Kailh testing, I listened to some of the questions. The court did not enter judgment against Kailh testing in favor of L.B. Steele or in favor of welds, and the reason the court didn't is because Kailh testing was not a party to the case. Kailh testing interpleaded the money. They put in the money, and they were dismissed from the case. Well, there was a question about that, that Kailh testing interpleaded the money, and so it was money that Kailh testing owed to somebody who did they owe it to. The court said, I'm going to allow L.B. Steele's claim over Walsh's, because Walsh had claims too against the county, and the court really didn't favor L.B. Steele on those claims, and then all said or gave credit to, whatever word you want to use, you use both interchangeably, to Walsh for that amount. In other words, and we still got credit for it, but it reduced to $27.5 million, and the court directly pursuant to its acrimony powers ordered that those funds be dispersed. And I do want to point to the court, the record, citation, where there's a separate order in this case where Kailh testing is dismissed with prejudice. Well, no, we understand that. It was a significance of that judgment. It was dismissed because they interpleaded the money. Okay, and there was a significance. It's a claim between two identical parties. L.B. Steele and Walsh with respect to those funds. The statute directly, but anyway, you look at it, those are the same parties, and the court found that and all said or credited L.B. Steele with that amount against the $27.5 million. Same parties. I said the parties, and then the credit, and that combined or reinforced by the power that the court has to disperse funds that are in their deposit. It's the same way with the lien claim. The lien claim also has the lien act itself, which provides that the court may order the disbursement of funds. In 60-23, it provides that the court, when it has funds on deposit under the lien act, may order its disbursement in accord with its operable powers. And that's what it did here, both with respect to the lien claim, for which L.B. Steele got credit as part of the $6.5 million. So you have the lien claim. If you wanted to break it down into individual orders. You've got to make this real simple for me. L.B. Steele is the one that the court found was entitled to the money that was interpreted by CalDES. Correct. Is that not the case? Yes. It's the competing claims between Walsh and Cal, and L.B. Steele. It was ultimately determined that it was L.B. Steele that was entitled to the money that CalDES was giving. Now look at the judgment. I've got the judgment on it. He had directed those funds to be disbursed to Walsh. Well, we understand that it was disbursed to Walsh, but it was disbursed to Walsh as a credit against the $27 million judgment that was entered in favor of Walsh v. L.B. Steele. And what's wrong with that? He took L.B. Steele's money and said, give it to Walsh. The question is, was it an appropriate setup? Of course it was, Judge. They were at the same time. L.B. Steele and Walsh. Wait a minute. Hold on. Mr. Shearer. Okay. Let me make it real simple. Okay? Okay. I owe you $50. Judge Hall owes me $25. No court can order an offset from Judge Hall to you. That's it, but to you again. No. She's got to give me the money and then I've got to give it to you. No, no, no. The court can say. It's not between the same parties, Mr. Shearer. It's not between the same parties. No, it's not. L.B. Steele and Walsh. They're perfectly— No, no, no. If that were correct, if that were correct, then what you're saying is correct. A judge could order a set-off as against a judgment in favor of a party. Any amount of money that was owed to the other party from whomever. In this particular case, let's get to the L.B. Steele in the interpreter money. Sure. Let's go to the paragraph. Okay. Judgment is entered in favor of L.B. Steele on count five, three, four, five, blah, blah, blah, for a principal amount of $18,815,696 plus a proof of interest that was deposited with the court by Cal Testing. Right. Cal Testing interprets the money and says, I've got more than one person that's claiming this money. Right. I don't know to whom it is owed, but I owe it. Right. And the court said judgment was entered in favor of L.B. Steele. So Cal Testing owed L.B. Steele $1.8 million. Judge, can I respectfully disagree with the way you described that? Cal Testing wasn't awarded anything. We're out of the case. Cal Testing— Mr. Filio— Mr. Filio— Stop. I know Cal Testing was dismissed. I know they weren't dismissed because they interpreted the money they owed. And who was left contesting the right to that money? That's not the point. Right. The judgment was entered in favor of L.B. Steele. It was determined that Cal Testing owed L.B. Steele the $1.8 million right. So the court gives a judgment in favor of L.B. Steele. You want that to be offset. That's what the judge did. Well, we understand that. L.B. Steele contends it was incorrectly done. Isn't that their issue? And they're wrong because it's two identical parties contesting the rights to these funds. It's not. At the same time— But the judge didn't find it wrong. No, he didn't find it wrong. No, the judge does. That's why he credited L.B. Steele with that money. He would have credited L.B. Steele with that money. But it was vis-a-vis Cal Testing, not a judgment that was entered in favor of L.B. Steele against Walsh. Judge, I— And it would have to be offset. I think it's a set-up. It's two identical parties. Well, that's in— to pay the $25 when you accept on a citation proceeding. Well, some of that— There's no set-up. No. No. Can't be set-up. Because there's no return. I don't owe you. She doesn't owe you the $25. So you can't take her $25 and say, now offer me only less. I understand your honest point. I'm very, very respectful. But let me also suggest to you that Judge Griffin also understood that point. And Judge Griffin has a lot of power, of inherent, accurate power, to disperse funds that are on deposit with the court. And there's a legion of cases that say that. And here's what he did. He looked at all of the circumstances. He knew what was going on here. Walsh was damaged to at least $27.5 million. And L.B. Steele's going to walk away with cash and a million eights? That's not— Cash and a million eights? Well, that's not rational. And he knew that. So he owed her, Mr. Fiedler. Talk to me about the $4.5 million that they said you acknowledged that you owed. Well, we didn't acknowledge that we owed it. We said if L.B. Steele had performed, fully performed its contract and Walsh was made whole, then we would have owed it. But they didn't. That's what he said. I need time. Okay. Okay. But that—I just—can I just summarize one thing on the one point? The cash tax and money. I think— I don't know if you want to go there. Okay. I love Steele. Am I coming back here at all? No, you're done for the day. Your Honor, as in the trial, there wasn't much mention of Carlos Steele, and there's not in this appeal either. With respect to the argument that they make about 39 miles of good wells, we brought this out in our argument, too, that the space shuttle that exploded, exploded on some minor O-rings. There might have been good welding throughout the space shuttle, but the O-rings caused that space shuttle to explode. So as Judge Hoffman asked, if you do four beams with good welds and a fifth causes the building to collapse, have you substantially performed? There's none of that. There's 39 miles of good welds. They didn't go out there with a measuring stick and figure out 39 miles. That comes from L.B.'s president. He's just saying that would be 39 miles. It's the position of L.B. Steele that if you don't fix it, it's accepted. That wasn't the case. Yes. Talk to me how the UCC changes this analysis according to itself. The announcement. You've accepted the good. As counsel said, we didn't accept it. It was not accepted. The city wouldn't pay for it. Once the inspections revealed that the roofing is delaminating and cracked, and there's cracks in the columns, the city didn't accept it. It was not accepted and it wasn't paid. They didn't issue any payments for it. And that's why Carver couldn't pay L.B. Steele. City didn't pay Walsh. Walsh didn't pay Carver. And therefore, as I argued before, the condition preceded did not occur. In addition, Judge, L.B. Steele is arguing for a mechanic's lien. There is no lien when you materially breach the contract. I don't think there's any question there. I think the case is safe. There is no lien when you fail to substantially perform it. Different than material breach. They are different concepts. Right. I mean, material breach can be a failure to substantially perform, but they are separate concepts. And in this case, it was their obligation and the whole intent of that subcontract is for them to do fabrications in accordance with the American Railroading Society, and that wasn't done. And there's no evidence, certainly, that Carver or Steele had any participation in that. That's all I have. Okay. Thank you, counsel. Five minutes for L.B. Steele. Thank you. First of all, counsel's is wrong whether it was accepted or rejected. If you keep the product, if you keep the goods, and you remediate the goods, they're accepted. First of all, they didn't reject them. They kept them. They didn't even throw them away. They accepted them and remediated them. That's accepted. Secondly, as far as Walsh arguing that, well, there may be other functions that we should have fixed. You know, Justice, the case was tried. If there were other material portions that needed to be remediated or needed to be fixed or that they were going to present evidence that weren't good, they should have done it at the trial and they didn't. Moreover, if they hadn't done it, as of today, I would respectfully suggest that it's because they're not material. They're not dangerous. They're not any of those things. They say they designed it wrong. They're never going to fix them because they designed something that went along their defense. They created structures that made it so they weren't material. It's a bad argument. And in any event, there's no evidence at the trial that they admit that there's no evidence at the trial that the other 38 miles of the construction was bad. As far as the equitable power, Your Honor, your justices, judges do have equitable power, and they cite cases that say they have equitable power. What they don't have the equitable power to do is to directly violate Illinois law, which is what they're asking the justices here to do, which is to set off judgments against different parties. And the reason I was saying how the act was structured is because the act is actually structured so that officers of the court can set it off because it was an older act. So there are cases that say, well, the court has equitable power to enforce it. They have equitable power to enforce the set-off statute, not to violate it, not to set off judgments between different parties. And Justice Hoffman, I couldn't agree more with the idea that if you wanted to have that payment made by someone else, you would need a citation. And what they did here, Your Honor, what Walsh did is they convinced the circuit court to immediately enforce the order incorrectly in violation of other creditors' rights. And there are other creditors in the bankruptcy court. We understand why they wanted the set-off, because if they didn't get the set-off, it's going to the bankruptcy court, and they're not going to collect the money. Some other creditors are going to get a piece of it. Yes, and I would just respectfully say that it's not that they won't collect money. It would be taken and distributed as the federal bankruptcy laws provide for this country, and I would respectfully suggest that they will get a portion of it, or they're expected to get a portion of it after, if you do what the public is asking you to do, which is to reverse the set-offs between different parties. The order was to pay RBCL all amounts they received based on the wrongful set-offs, which should equal whatever amount that they received from the clerk of the circuit court, to reduce the judgment of Walsh by the $8 million that should have been credited for the payment for Zurich and for all the consistent work that we've requested. I appreciate your time. Thank you very much. Thank you. The case will be taken under revisement. Thank you all.